IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

DANIELLA M. MOLNAR,                    )    CASE NO.  1:23-CV-1314
                                       )
              Plaintiff,               )
                                       )
       vs.                             )    MAGISTRATE JUDGE
                                       )    JONATHAN D. GREENBERG
                                       )
COMMISSIONER OF                        )
SOCIAL SECURITY,                       )    **MEMORANDUM OF**
                                       )    **OPINION AND ORDER**
              Defendant.               )
                                       )

Plaintiff, Daniella M. Molnar ("Plaintiff" or "Molnar"), challenges the final decision of
Defendant, Commissioner of Social Security ("Commissioner"), denying her application for Disability
Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 423. This Court has
jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. §
636(c)(2).  For the reasons set forth below, the Commissioner's final decision is **AFFIRMED.**

## I.    PROCEDURAL HISTORY

In May 2021, Molnar filed a DIB application and alleged a disability onset date of September 1,
2011. (Transcript ("Tr.") at 20, 91 ) She alleged disability due to "POTS, Mast Cell Activation
Syndrome, Supraventricular Tachycardia, Small Fiber Sensory Neuropathy, Raynauds, Ehler Danlos
Syndrome." (Tr. 92)  Molnar's application was denied initially and upon reconsideration, and Molnar
requested a hearing before an administrative law judge.  (Tr. 95, 108, 115 119)

On April 28, 2022 ALJ Paula Goodrich ("ALJ") held a telephonic hearing, during which Molnar,
represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 42-90).  On August 10,

1

2022, the ALJ issued a written decision finding Molnar was not disabled. (Tr. 14-42) The ALJ's decision became final on May 16, 2023, when the Appeals Council declined further review. (Tr. 1-91)

On July 5, 2023, Molnar filed a Complaint challenging the Commissioner's final decision. (Doc. No. 1.) The parties completed briefing. (Doc. Nos. 8, 10, 11) Molnar asserts the following errors:

1. The ALJ's findings at Step Two were not supported by substantial evidence.

2. The ALJ's findings against Dr. Dubravec's was not supported by substantial evidence.

3. The ALJ's exclusion of restrictions on sustainability of employment was not supported by substantial evidence.

(Doc. No. 7 at 12-20)

## II.     EVIDENCE

### A.     Personal and Vocational Evidence

Molnar was born in 1981. (Tr. 96, 97) The ALJ determined that Molnar was insured for disability insurance benefits under Title II of the Social Security Act ("the Act") through June 30, 2015 (Tr. 20-21, 224). The ALJ further determined that Molnar was insured for Medicare benefits under Title XVIII of the Act through December 31, 2016 (Tr. 21, 235). The ALJ considered the period from the alleged onset date through December 31, 2016, when her insured status for both types of benefits expired (Tr. 21).

### B.     Relevant Medical Evidence[1]

#### 1.     Treatment Notes (September 2011 – December 2016)

On September 24, 2011, Molnar underwent a cesarean section surgery due to the premature labor and delivery of her first child. (Tr. 872) In January 2012, Molnar presented to Fadi N. Bashour, M.D. of

---

[1] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs. Though Molnar's Brief includes an extensive evidentiary list (from 1999-2022), her period of disability is 2011-2016. Moreover, much of the evidence is listed without any suggestion of relevance. For example, many citations state only "outpatient observation" or "outpatient pregnancy check-up." (Doc. No. 7 at 2, 4) In the interest of judicial economy, the undersigned's summary is limited to the medical evidence that is relevant to the parties' arguments and close in time to the period of disability. To the extent, Molnar's extensive evidentiary listing seeks to demonstrate the number of appointments Molnar had, that issue is addressed in the final section of this recommendation and, for the reasons stated therein, does not require a recitation of each appointment here.

Digestive Disease Consultants. (Tr. 369-71) Molnar reported, "lots of bowel trouble, abd bloating and cramps, worse with certain dietary triggers, particularly Gluten, gets loose stools, diarrhea and occasional BRB on toilet paper." (Tr. 370) A physical examination yielded normal results and labs were ordered. (Tr. 371) A February 2012 colonoscopy revealed external and internal hemorrhoids and resulted in the removal of two colon polyps. (Tr. 350, 356) Other findings were normal. (*Id.*) In March 2012, Molnar returned to Dr. Bashour reporting nausea and stomach dyspepsia. (Tr. 343) Dr. Bashour noted the following:

> Feeling much better, her reflux seems better since started using her PPI regularly, still complain of lots of [nausea], worse at night with some abd discomfort. Not sleeping well, under stress of relocating to Knoxville and selling her house. Regular stools, no rectal bleeding.

(Tr. 345) A physical examination was normal. (*Id.*)

In June 2012, Molnar visited John Haydek, M.D., of Gastrointestinal Associates PC. She complained of abdominal distress (burning, fullness, bloating, pain radiating in back). (Tr. 378, 391) She stated her problems started two years prior and that she felt good in the morning but was symptomatic after eating. (Tr. 391) Fructose testing and an MRI of the abdomen were both normal. (Tr. 386, 447)  In July 2012, Molnar returned and reported that she still had symptoms whenever she ate but "maybe [was] a little better on a very strict diet avoiding wheat (Gluten) lactose and many spices." (Tr. 388) Dr. Haydek found Molnar's symptoms were unexplained by objective testing by her prior gastroenterologist. (Tr. 389) Dr. Haydek suspected a functional disorder and recommended a full food allergy testing profile. (*Id.*) Molnar also complained of fatigue, hair loss, back and joint pain, muscle weakness, dizziness, numbness, tingling, anxiety, depression, and panic attacks. (Tr. 392)

At an October 2012 annual gynecologic exam, Molnar reported a history of endometriosis. (Tr. 666) An examination of her cervix was  abnormal and later testing showed "moderate to severe dysplasia with HPV effect" (Tr. 691) In November 2012, bloodwork for inflammatory diseases returned normal results (Tr. 858)

3

In December 2012, Molnar reported to Dr. Haydek that she had abdominal pain "burning in nature, and radiates throughout her abdomen and into her upper back." (Tr. 375) Dr. Haydek stated that Molnar's symptoms were "unexplained" by earlier "extensive bloodwork, EGD pathology and colonoscopy." It was also noted that a December 2012 endoscopy with Dr. Haydek showed "no abnormally increased proliferation of tissue mast cells." which was the consensus opinion of two gastrointestinal pathologists.[2] (Tr. 376) In December 2012 visits with an allergist, Molnar reported the following gastrointestinal symptoms: "abdominal pain bloating, pain, bloody stools, "nausea or vomiting, belching or excess gas, indigestion, and diarrhea." (Tr. 426-29) Molnar also reported a host of other symptoms including fatigue, cough, headaches, dizziness, poor balance, trouble sleeping, night sweats, joint pain and stiffness. (*Id.*) A patch test was ordered. (Tr. 428-29)

Medical visits throughout 2013 included complaints of abdominal pain, fatigue, nausea, malaise, poor sleep and "many intolerances." (Tr. 635-38, 654-59, 674-80) At the end of the year, a progress note reported that Molnar described her abdominal pain as gnawing and a "10/10 pain scale." (Tr. 670) However, it was also noted that Molnar showed "recent improvement with dietary modifications," that many of her symptoms had resolved since she started milling her own flour at home, and that she "has been feeling somewhat better overall." (Tr. 670-72).

In July 2015, Molnar had an annual gynecological exam. A past history of endometriosis and polycystic ovarian syndrome was noted. (Tr. 544) Molnar reported urinary complaints. (*Id.*) A December 2016 annual gynecological exam did not note any complaints. (Tr. 576-77) The record also includes prenatal records from Molnar's two pregnancies since the alleged onset date. (Doc. No. 7 at 2-9).

---

[2] When referencing this medical finding, Molnar fails to include the "no" from the doctor's quotation. Molnar states that the Endoscopy found "abnormally increased proliferation of tissue mast cells." (Doc. No. 7 at 3) However, as the Commissioner points out, the report states "**no** abnormally increased proliferation of tissue mast cells." (emphasis added)

### 2.    Records After December 2016 Expiration of Benefits

At a December 2018 gynecological visit, Molnar reported that she had been "diagnosed with mast cell overactions." (Tr. 565) On July 22, 2019, Molnar had an initial assessment with Martin Dubravec, M.D. (Tr. 461-64) Dr. Dubravec stated that Molnar presents with symptoms of mast cell activation syndrome, dysautonomia (POTS), and generalized joint hypermobility. (Tr. 461) He recommended testing and a follow up with her primary care physician, Karen M. Hummel, M.D. (*Id.*) Surgical testing with Dr. Fadi Bashour on July 29, 2019, revealed "excess mast cells." (Tr. 474, 477) At a September 2019 visit with Dr. Hummel, Molnar reported that testing was supportive of MAST cell hypersensitivity/MAST cell activation syndrome (MCAS). (Tr. 595) It was noted that Molnar was prescribed singulair, xyzal, a homeopathic mast cell stabilizer, and pepcid. (Tr. 595) In October 2019, Molnar returned to Dr. Dubravec for a MCAS follow up. (Tr. 459) Dr. Dubravec stated that he believed Molnar "has a diagnosis of [MCAS] based upon her colonic biopsy results as well as her significant symptoms." (Tr. 459) It was reported that Molnar was "approximately 10-15% better with her current mediations" and "[a]t times, she feels as much as 50% better" but she had "room to go with getting better." (Tr. 460)

### 3.    Medical Opinions

At the initial determination, state agency medical consultant Louis Goorey, M.D., found Molnar had no severe impairments (Tr. 93-94). At reconsideration, Lynne Torello, M.D., found Molnar had severe gastrointestinal disorder but determined the evidence was insufficient to determine Molnar's residual functional capacity. (Tr. 98-99)

In December 2020, Dr. Dubravec completed a form that stated Molnar was diagnosed with mast cell activation syndrome ("MCAS"), that her MCAS was severe, and her MCAS results in "multiple and varies" limitations in sitting, standing, walking, or lifting and activities of daily living. (Tr. 466) Dr. Dubravec also provided a letter dated May 19, 2022. The letter states he started treating Molnar for

MCAS in July 2019. (Tr. 1018-1019). He also stated that, based on his review of Molnar's medical records and symptom log, he believed that Molnar's symptoms were consistent with MCAS as far back as 2012. (Tr. 1018). Dr. Dubravec opined Molnar's impairment would cause her to be absent or tardy to work at least three times per month (Tr. 1018).

**C.  Hearing Testimony**

During the April 28, 2022, hearing, Molnar testified to the following:

- **Impairments:** She was diagnosed with endometriosis and polycystic ovarian syndrome. She has frequent pain from endometriosis flare ups. She was prescribed birth control and anti-inflammatories. A few weeks after her child was born in 2011, she started experiencing flare ups after eating that resulted in stomach pains, migraines, facial flushing, and dizziness. In 2019 she was diagnosed with "mast cell disease, POTS…[and] supraventricular tachycardia." She stated she is "very medicine reactive" which makes it difficult to treat her conditions.

- **Daily Living:** She lives with her husband and three children. She drives her children around a few days a week and does not have a disability placard. Before her disability onset date she worked as a personal trainer.

(Tr. 52- 80)

VE, Michele Edge, ("VE") also testified at the hearing.  (Tr. 80-89). The VE testified that there would be no jobs for an employee who is either absent, tardy,  leaves early (or a combination of the three) two days a month on a regular and continuing basis. (Tr. 85-87)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).  A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667

6

F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant met the insured status requirement under Title II of the Act for a period of disability and disability insurance benefits on June 30, 2015.

2.  The claimant met the insured status requirement under Title XVIII of the Act for Medicare Part A hospital coverage on December 31, 2016.

3.  The claimant did not engage in substantial gainful activity during the period from her alleged onset date of September 1, 2011 through the controlling date last insured of December 31, 2016 (20 CFR 404.1571 *et seq.*).

4.  Through the controlling date last insured of December 31, 2016, the claimant had the following medically determinable impairments: endometriosis status post (s/p) remote myomectomy, and polycystic ovarian syndrome (PCOS); and gastroesophageal reflux disease (GERD) with esophagitis, gluten intolerance and other food allergies, and s/p excision of benign colonic polyps (20 CFR 404.1521 et seq.).

5.  Through the controlling date last insured of December 31, 2016, the claimant did not have an impairment or combination of impairments that significantly limited the ability to perform basic work-related activities for a period not less than 12 consecutive months. Therefore, the claimant did not have a severe impairment or combination of impairments during the period through the controlling date last insured (20 CFR 404.1521 et seq.).

6.  The claimant was not under a disability, as defined in the Social Security Act, at any time from September 1, 2011, the alleged onset date, through the controlling date last insured of December 31, 2016 (20 CFR 404.1520(c)).

(Tr. 20-34)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs*., 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence

8

*de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v.Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot

determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v.Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D.Ohio July 9, 2010).

## VI.    ANALYSIS

In her sole assignment of error, Molnar argues that the ALJ made several errors at step two of the sequential evaluation process. (Doc. No. 7 at 12-20) First, Molnar argues the ALJ erred in finding her symptoms were inconsistent with other evidence. (*Id.* at 12-16) Second, Molnar argues the ALJ erred in finding Dr. Dubravec's opinion was unpersuasive. (*Id.* at 17-20) Third, Molnar argues that the ALJ failed to give proper consideration to Molnar's absenteeism. (*Id.* at 20)

At step two of the sequential evaluation process, an ALJ must evaluate whether a claimant has a "medically determinable physical or mental impairment." 20 C.F.R. § 404.1520. A medically determinable impairment ("MDI") "results from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques" and "must be established by objective medical evidence from an acceptable medical source." 20 C.F.R. § 404.1521. The impairment must also meet the durational requirement—"it must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1520. If the ALJ finds that the claimant has a medically determinable impairment ("MDI"), then the ALJ determines whether that impairment is severe or non-severe. *Id.* "Once one severe impairment is found, the combined effect of all impairments must be considered [in determining the claimant's residual functional capacity], even if other impairments would not be severe." *White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 787 (6th Cir. 2009).

The regulations define a severe impairment as one that significantly limits the ability to perform basic work activities. 20 C.F.R. § 404.1520(c). The severe impairment requirement is a threshold element which plaintiff must prove in order to establish disability within the meaning of the Act. *Gist v.*

*Sec'y of H.H.S.*, 736 F.2d 352, 357 (6th Cir. 1984). An impairment will be considered non-severe if it "does significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522. Examples of "basic work activities" are "abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;" "seeing, hearing, and speaking;" "understanding, carrying out and remembering simple instructions;" "use of judgment;" "responding appropriately to supervision, co-workers and usual work situations;" and "dealing with changes in a routine work setting." 20 C.F.R. § 404.1522(b). The severity requirement is a "de minimis hurdle" in the sequential evaluation process. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). Although the standard is de minimis, it is the claimant's burden at step two and a diagnosis alone "says nothing about the severity of the condition." *Id. see also Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 930 (6th Cir. 2007) ("The mere existence of those impairments, however, does not establish that [claimant] was significantly limited from performing basic work activities for a continuous period of time.").

Here, the ALJ considered a period of disability beginning in September 2011 and ending on December 31, 2016. (Tr. 25) The ALJ determined that during that period Molnar had the following MDIs: "endometriosis status post (s/p) remote myomectomy, and polycystic ovarian syndrome (PCOS); and gastroesophageal reflux disease (GERD) with esophagitis, gluten intolerance and other food allergies, and s/p excision of benign colonic polyps." (Tr. 21) The ALJ found that these digestive and reproductive system disorders were the only MDIs established by objective medical evidence or acceptable medical sources within the relevant period. (Tr. 21-22) However, the ALJ noted that Molnar submitted evidence of several diagnoses made after the relevant period including a 2019 diagnosis of Mast Cell Activation Syndrome ("MCAS"). (Tr. 22) The ALJ also addressed the impact of these diagnoses on the relevant period.

11

A.     **Symptom Consistency**

Molnar first argues that the ALJ erred in finding Molnar's symptom log was inconsistent with other record evidence. (Doc. No. 7 at 13-16) Molnar submitted a handwritten log of symptoms to the agency spanning a 10-year period. (Tr. 288-330) Molnar testified the log was reconstructed from contemporaneous electronic records. The ALJ reviewed the log but determined it had limited probative weight for several reasons. (Tr. 30) The ALJ explained that, during the relevant period, the symptom log was not mentioned in any of her treatment notes and there is "no indication she had ever provided this to a physician(s)—in spite of her testimony that the primary purpose…was so that her doctors could seek and review it" (Tr. 30) The ALJ also discounted the symptom log because Molnar admitted it was a *post hoc* manuscript of "app" entries and several statements are written in the past tense. (*Id.*) Last, the ALJ found the symptoms or severity of symptoms in the log were inconsistent with contemporaneous reports to providers. Molnar takes issue with the last finding. Molnar argues that the ALJ's determination that her symptoms log was inconsistent with the treatment notes is not supported by substantial evidence.

A review of the record shows that the ALJ's assessment of Molnar's symptom log is reasonable and supported by substantial evidence. The ALJ gave several examples of treatment notes that were inconsistent with the symptom log. For example, the ALJ found that a March 27, 2012, treatment note from Dr. Bashour showed a "significant discrepancy" with Molnar's March 2012 symptom log. Despite recording symptoms of "excruciating pain" most days  "after eating, feeling tired and weak, and having headaches," Molnar reported minimal symptoms to Dr. Bashour and even stated she was feeling "much better" with conservative medical treatment. (Tr. 27, 288)  A review of the treatment note shows that Molnar reported the following:

> Feeling much better, her reflux seem better since she started using her PPI regularly, still complain of lots of [nausea], worse at night with some abd discomfort. Not sleeping well, under stress of relocating to Knoxville and selling her house. Regular stools, no rectal bleeding.

12

(Tr. 345) Molnar argues that the treatment notes do not conflict with her log. Molnar contends that the "Feeling much better" comment only referred to her reflux. However, the ALJ's statement is not unreasonable or inaccurate. Molnar's March log recorded the following: "Knocked down – Body wide pain;" "Excruciating back pain;" "Stomach kept me awake all night;" "Ate lunch and was curled up in a ball of pain for 3 hours;" and "Pain all day." (Tr. 288) This is contrasted with Molnar's report to Dr. Bashour that she had "some" abdominal discomfort and "lots" of nausea. Accordingly, the ALJ's finding is not unreasonable and is supported by the evidence.

Molnar also takes issue with the ALJ's references to visits with Dr. Haydek. (Doc. No. 7 at 15). The ALJ found these visits also conflicted with Molnar's symptom log and explained as follows:

> The second point of period-relevant medical evaluation and treatment derives from Ms. Molnar's transfer to a different gastroenterologist in the State of Tennessee, John Haydek, M.D., over June 2012 through December 2012 (*see generally* Ex. 6F, 2F). At the June 2012 establishing visit, Dr. Haydek pertinently recorded her current presenting complaints of epigastric burning sensation, reflux, and bloating upon eating food and having irregular and frequent (five to six per day) bowel movements; but also noted stable weight with eating a "very healthy," gluten-free diet (Ex. 6F/4-5). Dr. Haydek noted that he was "comforted by" previously negative upper GI endoscopy and colonoscopy findings, related findings on tissue pathology biopsies, and blood work in the course of Dr. Bashour's evaluation earlier that year; he recorded some abdominal and lower epigastric tenderness but overall normal abdominal signs on examination; and he restarted proton-pump inhibitor therapy to manage generalized anxiety pain and otherwise a gluten intolerance (Ex. 6F/6-7). Additional testing ordered by Dr. Haydek included MRI of the abdomen that showed normal appearing bowels and enterography (Ex. 6F/21-22), negative laboratory blood work (Ex. 6F/15-20), a negative fructose challenge by breath test (Ex. 6F/12), and a negative genetics test showing "extremely low" genetic potential for celiac disease (Ex. 6F/13; *and see* Ex. 2F/1).
>
> A July 23, 2012 one-month follow-up records a normal abdominal examination, which included resolution of the initial tenderness, and reduced bowel frequency and still stable weight, in spite of Ms. Molnar expressing ongoing issues and frustration about the negative results from the battery of diagnostic tests done in a second gastroenterologist's evaluation (Ex. 6F/2-3).
>
> Both days of seeing Dr. Haydek as a "GI" doctor are notated in the symptom log, but as with Dr. Bashour there remains a general disconnect with the actual presenting complaints and with the notes indicating much more intense "endo pains" knocking her down, and other symptoms of feeling dizzy and weak both on these specific days and over this two-month period (*cf.* Ex. 14E/3,4). The written indication that she "held it together in front of him" at the July 2012 follow-up is not persuasive when considering the objectively nontender abdomen on physical examination.

13

(Tr. 26-27) Molnar takes issue with the ALJ's references to generally normal objective exams to "invalidate the consistent tracking of symptoms" and points out that Dr. Haydek "clearly outlines her continued complaint of abdominal pain, with a description of her abdominal pain symptoms." (Tr. 437). (Doc. No. 7 at 15) The ALJ acknowledged Molnar's abdominal complaints but found the severity of her complaints to Dr. Haydek was incongruent with the symptom log. Dr. Haydek's treatment note stated that Molnar reported pain that burned and radiated into her upper back area. (Tr. 437) But the ALJ pointed out that Dr. Haydek indicated previous objective testing and that testing ordered by Dr. Haydek was normal. The ALJ also determined that, "there remains a general disconnect with the actual presenting complaints and with the notes indicating much more intense 'endo pains' knocking her down, and other symptoms of feeling dizzy and weak both on these specific days and over this two-month period (*cf.* Ex. 14E/3,4)." (Tr. 27) Accordingly, although the ALJ acknowledged Molnar's consistent abdominal complaints, the ALJ found the severity of the listed symptoms in Molnar's log was incongruent with the severity reported to medical professionals. Thus, the ALJ found the treatment log unpersuasive. Molnar has not shown that the ALJ erred in this analysis or that her assessment was unreasonable.

Molnar also argues that the ALJ erred in finding her obstetrician visits were inconsistent with the symptom log. Molnar asserts that the "referenced visits were not for her ongoing symptoms, but instead for a routine pap, pregnancy check up, post-partum visit, or because the string to her Merina implant had gone missing. (Tr. 546, 568-9, 674-5)." (Doc. No. 7 at 15) It is unclear which part of the opinion Molnar is referring to in this section. However, the ALJ discussed the following gynecological exam in reference to Molnar's symptom log:

> One day before the controlling date last insured, a December 30, 2016 annual exam with a gynecologist physician similarly reports nothing in the way of skin-related, endocrine-related (including chronic fatigue), gastrointestinal-related, or vertigo-related complaints, but instead has Ms. Molnar relating that she was in a generally "good state of health" (Ex. 14F/15). This is

14

again inapposite the symptom log entries showing the entire month of November 2016 was afflicted by "endometriosis pains" and that she was effectively so fatigued or otherwise affected by other symptoms that she was on the "couch" for that month continuing into the month of December (*cf.* Ex. 14E/19). In fact, through this annual exam, no mention of PCOS or the alleged side/ovary-located pelvic pain is noted as a presented symptom, which is another major incongruity with the testimony about its occurrence and frequency at all relevant points and continuing years after year 2015.

(Tr. 28) The visit the ALJ referenced lists no endocrinological, gastrointestinal, or vertigo related complaints. Though Molnar is correct in stating that the referenced visit was an annual gynecological visit, not a gastrointestinal visit, the ALJ reasonably found that Molnar's symptom log was less convincing because Molnar listed severe symptoms in her log but failed to mention any of these issues during a doctor visits at that time.

In addition to the items above, the ALJ also found other evidence that was inconsistent with Molnar's symptom log. The ALJ references an August 18, 2016 primary care visit and found the treatment notes from that visit "bears no resemblance to Ms. Molnar's same-dated and earlier month entries on the symptom log for having stomach pains, having no energy to do daily tasks, and being on the 'couch' or 'floor' most days." (Tr. 28) As the ALJ notes, there is a striking distinction between Molnar's August 2016 log and the treatment notes at her August 2016 primary care visits. For instance, most days, Molnar's symptom log for August 2016 states, "Couch," "Floor," or "Knocked down." (Tr. 303) However, a treatment note from her annual health maintenance visit that month indicates that there were "no concerns today" and that Molnar's "health since the last visit [12 months ago] is described as good." (Tr. 609) No pain was reported and a physical exam yielded normal results. In a summary, the ALJ explained:

This point-by-point comparative analysis of the symptom log entries to a host of office notes over 2012 through 2016 demonstrate a high degree of inconsistency shown across the claimant's statements about her symptoms and the period-relevant medical evidence of record, which does not support a finding that any current statements about what the claimant was experiencing on a daily or otherwise frequent basis. For this reason, all other entries on the symptom log and the claimant's testimony received little evidentiary weight as to the alleged chronicity and overall persistence, intensity, and functionally limiting effects of any one

15

> symptom, let alone the numerous symptoms alleged in combination, passing the "severe" threshold in the regulations— *i.e.,* more than minimal limitation(s) in the ability to do basic physical, mental, or other work activities.

(Tr. 29)

Though Molnar believes that the ALJ could have—and should have—weighed the above-cited evidence differently, that is not an adequate basis for remand. *See, e.g.*, *Thomas v. Comm'r of Soc. Sec.*, No. 1:13CV1777, 2014 WL 2114567, at *16 (N.D. Ohio May 20, 2014) ("Essentially Plaintiff is asking the Court to reweigh the evidence, give her the benefit of the doubt to the extent that these facts may weigh in her favor and then advance a different view; however, this Court is charged with determining the sufficiency of the evidence not its weight). The Court must accord great weight and deference to an ALJ's determination about the consistency of a claimant's alleged symptoms. *Workman v. Comm'r of Soc. Sec.*, 105 Fed.Appx. 794, 801 (6th Cir. 2004) ("An ALJ's credibility assessment must be accorded great weight and deference."); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir.2003) (explain that in reviewing an ALJ's credibility determination, the Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [Plaintiff's testimony] are reasonable and supported by substantial evidence in the record." The Court must defer to an ALJ's findings if they are supported by substantial evidence, even if substantial evidence also supports the opposite conclusion. *Lindsley v. Comm'r of Soc. Sec.,* 560 F.3d 601, 604-05 (6th Cir. 2009); *see also O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020) (*quoting Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)) ("[T]he Commissioner's decision still cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ."). As the Sixth Circuit has explained, "an administrative law judge's credibility findings are virtually unchallengeable absent compelling reasons. *Shepard*, 705 Fed. Appx. at 442. Molnar presents no such compelling reasons here.

16

Further, the Sixth Circuit's opinion in *Herndon v. Comm'r of Soc. Sec.,* No. 20-6094, 2021 U.S. App. LEXIS 15178, at *12 (6th Cir. May 20, 2021) is instructive. In *Herndon*, like in this case, the ALJ found no severe impairments at step two. The Sixth Circuit explained that in such a case:

> The applicable standard is whether a claimant's symptom complaints are consistent with the other evidence in the record, including the medical opinion evidence, and inconsistency is not the only factor for the ALJ to consider. *See id.* at 247-48. Subjective complaints, even if internally consistent, shall "not alone be conclusive evidence of disability." 42 U.S.C. § 423(d)(5)(A). The ALJ considered Herndon's complaints, properly weighed them along with the entire medical record evidence, and provided a sufficient explanation for rejecting Herndon's subjective complaints as showing an impairment significant enough to interfere with her basic activities.

*Id.* Here, the ALJ considered Molnar's complaints, properly weighed them along with the entire medical record evidence and provided a sufficient explanation, supported by evidence in the record, for rejecting Molnar subjective complaints as showing an impairment significant enough to interfere with her basic activities. Nothing more is required. Accordingly, Molnar has not shown that the ALJ erred in assessing her symptom log.

### B. Dr. Dubravec's Opinion

In her second assignment of error, Molnar argues that the ALJ erred in her assessment of Dr. Dubravec's opinions.  (Doc. No. 7 at 17-20) Molnar asserts that the ALJ made a mistake in applying the step four factors for assessing medical opinions at step two. (*Id.* at 17) Molnar further argues that the ALJ's reasons for discounting Dr. Dubravec's opinion were not supported by substantial evidence and that the ALJ made impermissible medical judgments. (*Id.* at 18-19) The Commissioner responds that Molnar has not demonstrated that the ALJ erred and substantial evidence supports the ALJ's assessment of Dr. Dubravec's opinions. (Doc. No. 10 at 7-8)

### 1. Legal Standard for Reviewing Opinion Evidence

In January 2017, the Social Security Administration ("SSA") amended the rules for evaluating medical opinions for claims filed after March 27, 2017. *See Revisions to Rules Regarding the Evaluation*

17

*of Medical Evidence*, (Jan. 18, 2017). The new regulations, which apply to Molnar, provide that the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." 20 C.F.R. § 404.1520c(a). Accordingly, the new regulations eliminate any semblance of a hierarchy of medical opinions.  *See* 20 C.F.R. § 404.1520c(a). They also eliminate the agency's "treating source rule," which gave special deference to certain opinions from treating sources. 82 Fed. Reg. 5844 at 5853.  The new regulations require an ALJ to "articulate how he considered the medical opinions and prior administrative medical findings" in adjudicating a claim by explaining how he considered the factors of supportability and consistency, which are the two most important factors in determining the persuasiveness of a medical opinion or prior administrative medical finding. 20 C.F.R. § 404.1520c(b)(2).  The ALJ generally is not required to explain how he considered other factors. *Id.* (emphasis added); 20 C.F.R. § 404.1520c(b)(3). As Molnar's brief acknowledges, "[t]he Commissioner's conclusion will be affirmed absent a determination that the ALJ failed to apply the correct legal standard or made fact findings unsupported by substantial evidence in the record." *Kimberly P., v. Commissioner of Social Security*, No. 3:20-CV-227, 2022 WL 1100936, at *1 (S.D. Ohio Apr. 13, 2022). Further, as the Sixth Circuit Court has stated many times, the Court must defer to an ALJ's findings if they are supported by substantial evidence, even if substantial evidence also supports the opposite conclusion. *Lindsley v. Comm'r of Soc. Sec.,* 560 F.3d 601, 604-05 (6th Cir. 2009); *see also O'Brien v. Comm'r of Soc. Sec*., 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020) (*quoting Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 477 (6th Cir. 2003)) ("the Commissioner's decision still cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ.")

### 2. Analysis

Dr. Dubravec wrote a letter on May 19, 2022, stating that he had been treating Molnar since July 2019 for mass cell activation syndrome (MCAS). He further explained:

*Danielle has a diagnosis of mast cell activation syndrome based on her extensive history of symptoms consistent with this disorder, appropriate laboratory tests, and response to medical therapy. The treatments I have recommended and she has followed have helped prevent the worsening of her symptoms and stabilize her condition. However, we have not been able to eliminate her symptoms or improve them, in any significant manner.*

*Beyond my own evaluation of this patient and treatment notes, I have had the opportunity to review medical records from her. These medical records span a period from 2012 until present, I have also received and reviewed documentation that Danielle collected over the years regarding her ongoing symptoms. Given the detailed record keeping, symptoms documented, and patterns other symptoms, it is my opinion within a reasonable degree of medical certainty that her symptoms described from 2011 onward are indeed caused by mast cell activation syndrome. This is because these symptoms are consistent with the underlying syndrome and are typical of those who have this diagnosis.*

*Given my knowledge of this condition, the references within the medical records, and my personal treatment of this patient, I have no doubt as to the accuracy and truthfulness of the information that she has documented related to this condition.*

*Lastly, due to her consistent and ongoing symptoms from 2011 to the present. it is my opinion that the previously undiagnosed condition of mast cell activation syndrome would reasonable [sic] have caused her to be absent or tardy from work for at least three times per month from that time to the present. This is based upon my review of the medical documentation, Daniella's symptoms tracking, and my personal examination from 2019 until present. Comparing the symptoms I have personally witnessed, my treatment of Daniella, and the documentation prior to my treatment, I have no doubt that she would have experienced issues with absenteeism if work would have bene [sic] attempted from 2011 to when she began treatment in my office.*

(Tr. 1018-19).

The ALJ found that Dr. Dubravec's letter constituted a medical opinion that: (1) Molnar's symptoms over 2011-2016 are all or mostly attributable to a then-undiagnosed MCAS and (2) those symptoms were and continue to be "severe," via the significant work-related impact on attendance. (Tr. 31) However, the ALJ found that Dr. Dubravec's opinion was "not persuasive" because it lacked support and consistency with "period-relevant medical evidence." (Tr. 32) The ALJ further explained that she found Dr. Dubravec's opinion unpersuasive because of a "clear lack of treatment relationship during and over two years after the relevant period." (Tr. 33)

19

In addition to the letter, Dr. Dubravec submitted a December 4, 2020, response on a form indicating that Molnar's MCAS was "severe," caused "multiple and varied" exertional limitations and limitations of activities of daily living, and limited Molnar's residual functionality to "minimal." (Tr. 466) As with the letter, the ALJ found Dr. Dubravec's opinion on the 2020 form "not persuasive." (Tr. 33) The ALJ indicated that she discredited the December 2020 opinion for the same reasons she discounted the May 2022 letter noting the "opinion is unsupported by his own office notes since July 2019 and inconsistent with the other period-relevant medical evidence of record, which he only broadly stated to have reviewed without even a modicum of exampled specificity in the more recent statement." (*Id.*) The ALJ further stated that the "multiple and varied" limitations were "vague and further detracts from any meaningful supportability of this opinion as well, and no symptoms were listed." (*Id.*)

Molnar argues that the ALJ applied an incorrect standard because the "ALJ's attack on the opinion was for utilizing the factors reserved for opinions at step four." (Doc. No. 7 at 17) However, Molnar provides no support or further argument for this cursory statement.[3] Accordingly, any such argument is waived. Further, this Court has found that, "[a]s part of the Step Two analysis, the ALJ is required to 'articulate how [she] considered the medical opinions and prior administrative medical findings.' 20 C.F.R. § 404.1520c(a)." *Mason v. Comm'r of Soc. Sec.,* No. 5:23-cv-331, 2023 U.S. Dist. LEXIS 200288, at *26 (N.D. Ohio Nov. 8, 2023); *See also Martha P. v. Comm'r of Soc. Sec.*, Civil Action No. 23-10134, 2023 U.S. Dist. LEXIS 234437, at *13 (E.D. Mich. Dec. 11, 2023) ("As part of the Step Two analysis, the ALJ is required to 'articulate how [he] considered the medical opinions and prior administrative medical findings ....' 20 C.F.R. § 416.920c(a)."). Also, the Sixth Circuit has upheld

---

[3] It is well established that "issues which are 'adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.' " *See, e.g., Kennedy v. Comm'r of Soc. Sec.*, 87 Fed. App'x 464, 2003 WL 23140056, at *1 (6th Cir. 2003) (citing *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996)) (rejecting perfunctory argument); McPherson v. Kelsey, 125 F.3d 989, 995-996 (6th Cir. 1997), cert. denied, 523 U.S. 1050, 118 S. Ct. 1370, 140 L. Ed. 2d 518 (1998) (same); *McClellan v. Astrue*, 804 F. Supp.2d 678, 688 (E.D. Tenn. 2011) (court under no obligation to scour record for errors not identified by claimant).

ALJ step two determinations that reviewed medical opinions under the agency's guide for reviewing medical opinions. *See e.g. Herndon*, 2021 U.S. App. LEXIS 15178, at *15. Accordingly, Molnar's argument is waived. Even if Molnar had not waived the argument, the ALJ did not err in considering the persuasiveness of the medical opinions at Step Two.

Molnar also argues that the ALJ's provided reasons for discounting Dr. Dubravec's opinions were not supported by substantial evidence. First, she states the ALJ's determination that Dr. Dubravec's language was "vague" is unsupported. Molnar points out that Dr. Dubravec stated that he reviewed "appropriate laboratory tests, treatment notes, and Plaintiff's symptom log." (Doc. No. 7 at 18) (internal quotations omitted) With regard to vagueness, the ALJ stated:

> Dr. Dubravec's May 2022 statement offers no specificity whatsoever about the basis formulating his opinion of "as now, back then" and for the entire period at issue connecting symptoms to his July 2019 diagnosis of mast cell activation syndrome. Instead, it references far too broadly an "extensive history of symptoms consistent with this disorder," current results of "appropriate laboratory tests," "evaluation of…treatment notes…[and] medical records" since 2012 without one specified or discussed at all and, in apparent relation to her providing him with the same 2012-2022 "symptom log" at Exhibit 14E as "documentation that Danielle collected over the years regarding her ongoing symptoms" and "detailed record keeping," no offering at all about what particular symptoms matched those in any 2011-2016 or later medical reports that he had reviewed.

(Tr. 31) With regard to the December 2020 statement, the ALJ further found Dr. Dubravec's statement that Molnar's limitations were "multiple and varied" limitations was "vague" and "detract[ed] from any meaningful supportability of this opinion as well, and no symptoms were listed." (Tr. 33)

Molnar fails to cite to any authority in support of her position that the ALJ's vagueness finding was unreasonable. On the other hand, the Sixth Circuit has found that an ALJ's finding of vagueness is reasonable where the opinion provides generalized references to the evidence. *Makela v. Comm'r of Soc. Sec.*, No. 22-1047, 2022 U.S. App. LEXIS 28980, at *13 (6th Cir. Oct. 17, 2022) (appropriate for ALJ to discount medical opinion that was supported by vague references to medical records); Price v. Comm'r SSA, 342 F. App'x 172, 176 (6th Cir. 2009) ("Although Dr. Ashbaugh elsewhere referred to "testing"

that supported his conclusions, his response was vague and unhelpful."); *see also Vest v. Saul*, No. 5:19-CV-00486-MAS, 2021 U.S. Dist. LEXIS 54542, at *13 (E.D. Ky. Mar. 23, 2021) ("Dr. Landfield's conclusory and vague opinions fail to include the requisite analytical link between the clinical findings and the medical conclusions, leaving the conclusions fatally unsupported. To fill in the gaps and supply the needed connection, the ALJ would have been required to interpose her own medical determinations based on the clinical data, which she may not do.") Accordingly, it was reasonable for the ALJ to find that Dr. Dubravec's opinion was "vague" because he did not cite to any specific evidence in support of his opinions.

Molnar also argues that the ALJ played doctor when the ALJ determined that Dr. Dubravec's diagnosis of MASC was wrong. (Doc. No. 7 at 19) However, Molnar takes the ALJ's finding out of context. The ALJ did not find that Dr. Dubravec made an incorrect MASC diagnosis. Rather, the ALJ found that Dr. Dubravec's decision to predate Molnar's diagnosis was inconsistent with other objective evidence including biopsies from 2012 and 2019 that failed to document "a concern for excess mast cells." (Tr. 32) The ALJ noted the inconsistent objective evidence prior to the date Dr. Dubravec made his diagnosis does not negate his current diagnosis but rather conflicts with, "Dr. Dubravec's May 2022 sweeping statement that all the claimant's symptoms have been connectable to his current diagnosis and have been 'severe' since 2011." *Id.* Thus, the ALJ's review of the consistency of Dr. Dubravec's statement with prior medical evidence did not constitute an impermissible diagnostic judgment.[4]

---

[4] Molnar also argues that the ALJ "created a 'straw man' fallacy when she claimed Dr. Dubravec's opinion was based on symptoms not present between 2012-2016." The ALJ found that, several symptoms listed in Molnar's 2019 new patient consult with Dr. Dubravec were, "not features of the 2012-2016 (or later) medical reports, including dysautonomia-type symptoms, generalized joint hypermobility, neck pain, near syncope, flushing, and hives; and at least one symptom of 'buzzing; feeling deep in the skin was expressly 'new' in the past year (Ex. 7F/3,5)." (Tr. 31) Molnar asserts that most of the symptoms were consistent with Molnar's complaints over the years but cites only to "*string-cites supra*." It is unclear what string-cites or evidence Molnar is referring to and it is not the job of the Court to put flesh on the bones of Molnar's argument. Further, the ALJ's determination was based on symptom inconsistency with "medical reports." Even if Molnar's own log listed these symptoms, they were "not features" of medical reports during the period at issue as the ALJ stated. Thus, Molnar has not shown that the ALJ erred in making this finding.

Molnar has not shown that the ALJ made any errors or violated any regulation. Moreover, the ALJ's assessment that Dr. Dubravec's opinions were vague, unsupported, and inconsistent with other evidence is supported by substantial evidence. As the ALJ noted, aside from generalized references to the medical record, Dr. Dubravec failed to point to any specific tests, treatment notes, or other evidence in support of his broad and retroactive findings. In addition to supportability, the ALJ found Dr. Dubravec's opinions were inconsistent with the other evidence. The ALJ further found that objective medical records from the pertinent period also did not support Dr. Dubravec's findings and that the predated findings were based on Molnar's subjective systems. That determination is supported by substantial evidence. For instance, the ALJ found that objective testing conflicted with Dr. Dubravec's opinions including biopsies from 2012 and 2019 that failed to indicate a concern for excess mast cells.[5] The ALJ also discussed two state Agency medical opinions that conflicted with Dr. Dubravec's opinion, though the ALJ found one more persuasive. (Tr. 33-34) In addition, the ALJ noted that the evidence showed some improvement with conservative treatment such as diet and medication changes.[6] (Tr. 27-28, 34). The ALJ also questioned Dr. Dubravec's reliance on Molnar's subjective symptom log which, as discussed in the prior section, the ALJ found held little weight.[7] Accordingly, the ALJ's determination

---

[5] *See Harrier v. Berryhill,* No. 1:17-CV-01163-JAY, 2019 WL 12758078, at *5 (W.D. Tenn. Mar. 21, 2019) ("A lack of supporting objective evidence is a significant factor that the ALJ may consider when evaluating any medical opinion."); *McLearren v. Astrue,* No. 2:06-0071, 2009 WL 703294, at *10 (M.D. Tenn. Mar. 16, 2009) (finding substantial evidence to support discounting opinion, including "lack of objective medical evidence in [provider's] treatment notes to support his conclusion.")

[6] *See* 20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv) (stating an ALJ must consider the effectiveness of treatment); *Blaim v. Comm'r of Soc. Sec.,* 595 F. App'x 496, 499 (6th Cir. 2014) ("the mildness of [claimant's] treatment-mostly pain medication, weight loss, and exercise-suggested that his ailments were comparatively mild."); *see also Masters v. Comm'r of Soc. Sec.,* 707 Fed.Appx. 374, 380 (6th Cir. 2017) (finding the ALJ properly considered multiple factors, including conservative treatment, when assessing the medical evidence); *Lester v. Comm'r of Soc. Sec.,* 596 Fed.Appx. 387, 389 (6th Cir. 2015) (considering conservative treatment when weighing medical source statements).

[7] The Sixth Circuit has found that an ALJ properly discounts a medical opinion where it is based on subjective complaints. *Remias v. Comm'r of Soc. Sec.,* 690 F. App'x 356, 357 (6th Cir. 2017) (Finding the ALJ "reasonably discounted" a medical opinion based, in part, on the finding that the "proposed functional limitations were based largely on [claimant's] subjective complaints."); *Keeler v. Comm'r of Soc. Sec.,* 511 Fed.Appx. 472, 473 (6th Cir.2013) (finding substantial evidence supported the ALJ's decision not to give controlling weight to a physician's opinion because it among other reasons, it appeared to be based primarily on the claimant's subjective complaints.).

that Dr. Dubravec's opinions were unsupported and inconsistent with other evidence was sufficiently explained and supported by substantial evidence in the record.

As noted earlier, the Court will not reweigh evidence at this stage. The findings of the Commissioner are not subject to reversal even if the record contains substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)). Accordingly, the ALJ's supportability and consistency findings related to Dr. Dubravec's opinions were supported by substantial evidence and with the zone of choice.

### C.    Absenteeism

In her final assignment of error, Molnar presents the following argument:

> Plaintiff's conditions and medical treatment caused her to have appointments almost every month through the date last insured, and essentially beyond. (Tr. 343-1048). Plaintiff's summary of facts intentionally provided an outline format to show the sheer volume of appointments, scheduled due to her endometriosis, higher-risk pregnancies because of her myomectomy, celiac condition, or abdominal pain. (Id.). The vocational expert's testimony indicated both that reoccurring absenteeism or absenteeism during the probationary period, which lasts for ninety (90) days, would result in no occupations. (Tr. 87-88). Plaintiff's medical appointments exceed this threshold, and therefore the combination of her impairments have created a vocationally relevant impairment. The ALJ's decision, stopping at step two (2) with a flat-out denial of any restriction, was not supported by substantial evidence.

(Doc. No. 7 at 20). Many Courts have rejected the argument that "medical appointments alone, without additional evidence, are sufficient to require an absenteeism limitation in the RFC, particularly where there is no statement from a physician regarding absenteeism." *Riggio v. Comm'r of Soc. Sec.,* No. 3:22 CV 997, 2023 U.S. Dist. LEXIS 170992, at *9 (N.D. Ohio Sep. 26, 2023) (collecting cases).

24

Here, the ALJ never moved on to the RFC finding because she found no severe impairments at step two. Thus, the ALJ did not err. Further, the only physician statement regarding absenteeism was Dr. Dubravec, which the ALJ found unpersuasive. The ALJ also addressed Molnar's absenteeism argument as follows:

> As a final consideration, the post-hearing brief argues that the claimant's treatment history was "so frequent" over 2012-2015 that she would have had been absent from a job multiple days per month, which in turn implies argued severity (*see* Ex. 19E/2). But citing to routine follow-ups in prenatal care and otherwise no urgent or otherwise non-scheduled appointments with physicians, even when numbering at or under once per month in the latter three years, does not equate to symptom-related or otherwise impairment-related absences that would serve as a standalone reason to support that any one impairment was "severe."

(Tr. 34) Molnar has not addressed the ALJ's reasoning in her brief or shown that the ALJ erred. Molnar's post-hearing brief states that Molnar had at least 12 appointments in 2014 with the months of April and May having three each. (Tr. 337) However, as the ALJ pointed out, many of the appointments referenced by Molnar were pre and post-natal appointments related to the birth of a child in April 2014. (Tr. 28, 548)  Further, the ALJ found that regularly scheduled appointments "even when numbering at or under once per month in the latter three years, does not equate to symptom-related or otherwise impairment-related absences that would serve as a standalone reason to support that any one impairment was " 'severe.' " (Tr. 34). As noted, Courts do not find that the number of medical appointments alone are sufficient to warrant an absenteeism limitation. Similar reasoning should apply at step two—particularly because the claimant retains the burden of proof. Accordingly, Molnar has not shown that the ALJ erred in consideration of her absenteeism argument.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is **AFFIRMED.**

   **IT IS SO ORDERED.**

Dated:  April 3, 2024                                       *s/ Jonathan Greenberg*
                                                      Jonathan D. Greenberg
                                                      United States Magistrate Judge

25